IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CONNECTION TRAINING SERVICES, | : | CIVIL ACTION |
| a Pennsylvania non-profit corporation | : | |
| | : | |
| v. | : | |
| | : | |
| THE CITY OF PHILADELPHIA, | : | |
| PERRITTI DIVIRGILIO, individually, and | : | |
| JAMES FERRARO, individually | : | NO. 06-3753 |

MEMORANDUM AND ORDER

NORMA L. SHAPIRO, S.J.                                                        DECEMBER 30, 2008

Plaintiff Connection Training Services ("CTS") filed an action against defendants the

City of Philadelphia ("City"), Perritti DiVirgilio ("DiVirgilio") and James Ferraro ("Ferraro"),

director and deputy director, respectively, of the City Labor Standards Unit.  Count I of CTS'

amended complaint alleges violations of 42 U.S.C. § 1983 by the City.  Count II alleges

violations of 42 U.S.C. § 1983 by DiVirgilio and Ferraro.  Count III alleges violations by

defendants DiVirgilio and Ferraro of the Pennsylvania Public Official and Employee Ethics Act,

65 Pa. C.S.A. § 1101, *et seq*.  Defendants' motion for summary judgment on counts I and II will

be granted; the parties will be allowed an opportunity to brief the disposition of count III.

I.       BACKGROUND

         A.       The Parties

                  1.       Connection Training Services

CTS is a Philadelphia non-profit corporation providing construction training to ex-

offenders.  CTS training programs enroll mostly Hispanic or African American male ex-

offenders.  (Pl.'s Answer to Interrog. 3, Pl.'s Am. Br. in Opp'n to Defs.' Mot. Summ. J., Ex. 2.)

The programs do not require enrollees to have a driver's license or pay fees; there are no educational requirements beyond having a sixth grade reading and third grade mathematics competency.  Id.  CTS had approximately fifty trainees in its stucco training program in 2004. (Pl.'s Response to Defs.' Counterstatement of Proposed Stipulated Facts ¶ 28.)

Garnett Littlepage ("Littlepage"), Director and Program Manager of CTS, is also minority owner of LP Group 2, a for-profit construction business.  (Pl.'s Response to Defs.' Counterstatement of Proposed Stipulated Facts ¶ 25.)  Trainees in the CTS training program perform work for LP Group 2 on City construction projects at a base rate of $15.89 per hour.  Id. ¶¶ 26, 30.  The prevailing wage rate for unskilled laborers is $15.89 per hour plus $13.95 per hour in fringe benefits.  (Defs.' Mot. Summ. J. Ex. 14.)  LP Group 2 bid proposals for construction projects anticipate use of CTS trainees at less than prevailing wage rates.  (McIntyre Dep. 72, Sept. 25, 2007).  CTS claims it is necessary for its trainees to be paid less than prevailing wage rates for receive on-the-job training because employers will not hire trainees at prevailing wage rates.  (Pl.'s Answer to Interrog. 3.)

Littlepage testified that CTS trainees receive thirteen weeks of classroom education in reading, math, CPR certification, and OSHA certification.  (Littlepage Dep. 29-32, 71-72, Sept. 20, 2007.)  CTS trainees received a $250 per week stipend during classroom training.  After thirteen weeks of training, CTS trainees work on-the-job for LP Group 2 at $15.89 per hour.  Id. at 70.  Defendants have produced evidence contradicting Littlepage's testimony on various points but there is no dispute that CTS trainees are paid less than applicable prevailing wage for construction work in this area.

Much of CTS' continuing funding depends on its success in placing job trainees with

construction firms.  CTS can run two six-month construction training programs per year, and

receives $250,000 in government support for each training program.  However, since LP Group 2

is the only firm in Philadelphia working on City construction contracts willing to hire CTS

construction trainees, CTS can only conduct one training program each year.   CTS alleges that it

lost $500,000 in government support in 2005 and 2006 because of the two training programs it

could not offer. (Pl.'s Answer to Interrog. 3)

       **2.**     **Defendants**

      The City of Philadelphia[1], Perritti DiVirgilio, and James Ferraro are defendants.

DiVirgilio and Ferraro are presently being sued in their individual capacities[2] in conjunction with

their activities as Director and Deputy Director, respectively, of Philadelphia's City Labor

Standards Unit.

      Since August, 2005, DiVirgilio has served as Director of the Labor Standards Unit.  Prior

to his appointment to the Labor Standards Unit, DiVirgilio was a business agent for Laborers

International Union of North America, Local 332 ("Local 332").  (DiVirgilio Dep. 13-14, Oct. 4,

2007.)  His duties as business agent for Local 332 included ensuring workers' safety at job sites

and enforcing payment of wages set by collective bargaining agreements, for union and non-

union workers.  Id. at 14-15.  As a union member, DiVirgilio picketed job sites where employers

---

    [1]The amended complaint named the City of Philadelphia, Labor Standards Unit as a defendant.  However, City of Philadelphia subdivisions must be sued in the name of the City.  53 P.S. § 16257; City of Philadelphia v. Glim, 613 A. 2d 613, 616 (Pa. Commw. 1992).  By order dated February 11, 2008, the court ordered the docket corrected to replace defendant "City of Philadelphia, Labor Standards Unit" with "City of Philadelphia."

    [2]Defendants DiVirgilio and Ferraro had originally been sued in their official capacities as well, but the official capacity claims were dismissed by the court's order of January 11, 2007.

did not pay prevailing wage rates.  Id. at 37-38.  DiVirgilio maintained his union membership

and participated in union activities after being appointed to the Labor Standards Unit, id. at 32,

47, and continued receiving $1,500 per month for his services to Local 332 as recording secretary

and delegate to the Laborer's District Council.  (Pl's Prop. Stipulated Facts ¶¶ 6-7.)  DiVirgilio

testified at deposition that, as Director of the Labor Standards Unit, he based prevailing wage

rates on union collective bargaining agreements.  (DiVirgilio Dep. 36, Oct. 4, 2007.)

Ferraro is Deputy Director of the Labor Standards Unit.  Pat Gillespie, Ferraro's uncle

and head of the Building Trades Council,[3] had recommended Ferraro for a position within the

Labor Standards Unit.  (Ferraro Dep. 7-8, Feb. 20, 2007.)  In 1996, Ferraro was interviewed by

Joe Galdo, Labor Standards Unit deputy.  Id. at 25.  At the interview, Ferraro was told that as an

applicant for an exempt position appointed by the mayor, he did not have to take a civil service

test.  Id. at 21-22.  Jerry Murphy, then head of the Labor Standards Unit, told Ferraro he knew

Gillespie, who had forwarded Ferraro's resume to him.  Id. at 30-31.  Ferraro was hired shortly

thereafter and worked in the Labor Standards Unit until he resigned in 1999.

Ferraro wanted to rejoin the Labor Standards Unit in 2000 and started the application

process by contacting Gillespie again.  Id. at 51-52.  Juan Ramos, a union member, was then

Director of the Labor Standards Unit; Gillespie had been campaign manager for Ramos's City

Council campaign.  Id. at 49.  Within a few weeks, Ramos hired Ferraro to a civil service-exempt

position.  Id. at 53-54, 56-57.

In 2005, Ferraro was appointed as Deputy Director of the Labor Standards Unit.  This

---

[3]According to Ferraro, the Building Trades Council consists of building trade unions, including electricians, painters, plasterers, laborers, iron workers, cement masons, and plumbers, with the exception of carpenters.  Id. at 8.

position was not exempt from civil service requirements, unlike Ferraro's previous Labor

Standards Unit positions, but Ferraro was still not required to take any qualifying tests.  Ferraro

admits he serves at will.  Id. at 21-22, 42.

> **B.      The prevailing wage provisions**

The Philadelphia Code provides that every City contract for building or construction

work, for compensation that exceeds two thousand dollars, "shall contain a provision that all

employees performing city-work other than apprentices and trainees . . . shall be paid at least the

applicable prevailing wages . . . ."  Philadelphia Code §§ 17-107(1)(b) and (2)(b).  Prevailing

wage rates for certain occupational classifications[4] consist of: (1) the hourly wage for the relevant

occupational classification, determined by the United States Secretary of Labor under the Davis-

Bacon Act, 40 U.S.C. § 276, *et seq.*; plus (2) additional benefits given employees under a bona

fide collective bargaining agreement for such craft, trade or industry in the Philadelphia area, or

the monetary equivalent.  Philadelphia Code § 17-107(1)(m)(.2).  The prevailing wage rates for

all other occupational classifications consist of: (1) wages paid to the majority of workers in the

classification in Philadelphia, or the average paid to those employed in such classification; and

(2) additional benefits given employees under a bona fide collective bargaining agreement in the

Philadelphia area, or the monetary equivalent.  Philadelphia Code § 17-107(1)(m)(.1) and (.3).


An apprentice may be paid less than prevailing wage rates if:

(.a) Such apprentice is employed pursuant to, and individually registered in, a

---

[4]Such occupational classifications are those for which the United States Secretary of
Labor has calculated a prevailing wage under the Davis-Bacon Act, other than classifications of
building service employees.  Philadelphia Code § 17-107(1)(m)(.2).

*bona fide* apprenticeship program registered with the United States Department of Labor, Employment and Training Administration, Bureau of Apprenticeship and Training, or with a State Apprenticeship Agency recognized by the Bureau.

(.b) The ratio of apprentices to journeymen on the job site in any craft classification is not greater than the ratio generally prevailing in the relevant trade, craft or industry in the Philadelphia area, as determined by the Director.

(.c) Such apprentice is paid the full amount of fringe benefits set forth in subsection 17-107(1)(k)(.1)(b), with respect to the definition of prevailing wage.

Philadelphia Code § 17-107(2)(b)(.1). Philadelphia Code § 17-107 does not require apprentices

paid less than prevailing wage rates to be enrolled in apprenticeship programs affiliated with

organized labor.

Defendant DiVirgilio, as Director of Philadelphia's Labor Standards Unit, had primary

responsibility for monitoring and enforcing prevailing wage requirements and administering

exemptions. Philadelphia Code § 17-107(6) provides that the Labor Standards Unit must:

(a) Maintain a current schedule of the prevailing wages and working conditions for each occupational classification in each craft, trade, service and industry involved in City-work.

(b) Receive and refer to the Commissioner under whose supervision a City-work contract is being performed, complaints against any contractor or subcontractor for alleged violations of this section or the provisions of the City-work contract required hereby. Thereafter, the Director shall investigate such complaints and in connection therewith or with respect to any investigation shall have full power and authority to subpoena any witness, books, records, or other data of any person for the purposes of obtaining information pertinent to such investigation. The Director shall make a finding in writing with respect to each complaint filed, and shall send a copy thereof to the complainant and the contractor and shall maintain it on file. Upon request, the unit shall provide any affected contractor or subcontractor with a hearing, pursuant to subsection 8(e).

(c) Monitor the daily operations of contractors and subcontractors with respect to City-work contracts to insure compliance with this Section and with the prevailing wage provisions of any City-work contract.

Philadelphia Code § 17-107(6)(a-c).

On September 28, 1999, Ordinance No. 990221-A added a new provision, Philadelphia Code § 17-107(2)(b)(.2), allowing prevailing wage exemptions for training programs not certified by either the U.S. Department of Labor or the Pennsylvania Department of Labor and Industry.

> A bonafide member of a job training program may be paid less than the prevailing wage if said training program's purpose is to provide construction training opportunities and that the said training program has been has been approved by the City, a City Agency, or City-related Agency, and provided that the size of the construction project does not exceed 8 housing units.

Philadelphia Code § 17-107(2)(b)(.2).

Ordinance 990221-A also amended two other provisions in Philadelphia Code § 17-107. § 17-107(1)(p) was amended to define "City-related Agency" to include "quasi-public corporations" which "enter into continuing contractual or cooperative relationships with the City."  § 17-107(10) then required said City-related agencies entering building and construction contracts with the city to abide by § 17-107(2)'s prevailing wage requirements.

Ordinance 990221-A was not intended to take effect until the Minority Business Enterprise Council (MBEC)

> . . . certified to the Mayor and the City Council that each union involved in performing City Work, as defined in Section 17-107(1)(b) of the Philadelphia Code:
>
> (a) have recruited to their apprenticeship programs the maximum feasible number of residents of Philadelphia census tracts in which the median income is no greater than 30% (thirty percent) of the median income for the Philadelphia Standard Metropolitan Statistical Area; and
>
> (b) have in place a contractually binding program, to continually recruit to their apprenticeship programs, on an annual basis, the maximum feasible number of

7

residents of Philadelphia census tracts in which the median income is no greater
than 30% (thirty percent) of the median income for the Philadelphia Standard
Metropolitan Statistical Area; and

(c) have in place a contractually binding program assuring that persons recruited
as apprentices pursuant to paragraphs 2(a) and (b) above will be assigned, in
reasonable proportion to their overall numbers, to the full range of jobs available
to such unions on a continuing and long-term basis.

Philadelphia Code § 17-107, n. 22.  MBEC never made this certification to the Mayor or the City

Council.  (Defs.' Counterstatement of Proposed Stipulated Facts ¶ 20; Pl.'s Response to Defs.'

Counterstatement of Proposed Stipulated Facts ¶ 20.)

However, neither DiVirgilio nor Ferraro were aware of the required MBEC certification

prior to this litigation.  (Pl.'s Response to Defs' Mot. Summ. J. 38, citing DiVirgilio Dep. 21-24,

Oct. 19, 2007.)[5]  Ferraro testified that the Labor Standards Unit acted as if both § 17-107(1)(p)

and § 17-107(10) were in effect, by making sure that city contractors meeting the newly-

expanded definition of "City-related agency" paid their workers prevailing wages.  (Ferraro

deposition, N.T. 53-55).

## II.    STANDING

Defendants implicitly question CTS' standing to sue, asserting that CTS lacks a direct

pecuniary interest in the enforcement § 17-107(2)(b)(.2)'s prevailing wage exemption.  Article III

§ 2 of the United States Constitution confers jurisdiction over "cases" and "controversies."  A

plaintiff must have standing to sue, <u>Raines v. Byrd</u>, 527 U.S. 811, 818 (1997), by being able to

demonstrate: (1) an "injury in fact" – an invasion of a judicially cognizable interest which is (a)

---

[5]On October 1, 2008, Philadelphia Mayor Michael Nutter announced that he was
dissolving and replacing MBEC because of its failure to aid the integration of women, minorities,
and the disabled into the pool of persons employed under City contracts.  However, this
development does not effect the legal questions before the court.

"concrete and particularized" and (b) "actual or imminent," not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of; and (3) it is "likely," as opposed to merely "speculative," the injury will be "redressed by a favorable decision." Lujan v. Defenders of Wildlife, 504 U.S. 55, 560-61 (1992).

The court does not have jurisdiction if the asserted harm is a "generalized grievance shared in substantially equal measure by all or a large class of citizens." Warth v. Seldin, 422 U.S. 490, 499 (1975). The plaintiff generally must assert its own legal rights and interests, not the legal rights or interests of other parties, id., and bears the burden of establishing standing to sue. Lujan, 504 U.S. at 561.

CTS alleges it has been greatly harmed by defendants' enforcement of Philadelphia's prevailing wage requirement against LP Group 2, the only Philadelphia construction firm willing to hire CTS trainees. Because no other construction firm contracting with the City will hire CTS trainees, CTS attracts fewer trainees and conducts fewer training programs, and receives much less government funding as a result. In particular, CTS claims it received $500,000 less government funding for 2005 and 2006 because it held only two six-month construction training programs as opposed to the four programs it could have run during those two years.[6]

CTS also claims its mission to educate ex-offenders has been impaired because enforcement of the prevailing wage requirement prevents its students from gaining on-site

----

[6]Even if LP Group 2 is the only construction firm working on Philadelphia City contracts willing to hire CTS trainees, CTS fails to allege whether it sought to place construction trainees with firms not working for the City and thus not subject to the prevailing wage requirement. The fact that Littlepage is both CTS' director and minority-owner of LP Group 2 makes this silence more notable. Nonetheless, the plausible loss of funding CTS alleges is grounds enough for its Article III standing.

training.  If § 17-107(2)(b)(.2)'s wage exemption was in effect, CTS can reasonably allege actual,

concrete injury resulting from defendants' allegedly discriminatory enforcement of prevailing

wage rates required by City Ordinance.  It is likely that if defendants do not enforce the

prevailing wage requirement against CTS trainees, CTS may recruit more students to its training

program.  The alleged injury is not generalized to a large class of citizens, but particular to CTS.

CTS has standing to pursue its claims.

## III.    DISCUSSION

CTS, filing identical claims under 42 U.S.C. § 1983 in counts I and II of its amended

complaint, alleges that defendants are violating its rights to due process and equal protection

under the Fourteenth Amendment to the United States Constitution[7].  A motion for summary

judgment is granted if "the pleadings, depositions, answers to interrogatories, and admissions on

file, together with the affidavits, if any, show that there is no genuine issue as to any material fact

and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The

moving party bears the burden of proving no genuine issue of material fact exists.  Matsushita v.

Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 n. 10 (1986); Ideal Dairy Farms,

Inc. v. John Labatt, Ltd., 90 F.3d 737, 743 (3d Cir. 1996).  The underlying facts and all

reasonable inferences are viewed in the light most favorable to the nonmoving party.  P.N. v.

Clementon Board of Educ., 442 F.3d 848, 852 (3d Cir. 2006).  For a nonmoving party to survive

a motion for summary judgment, there must be "sufficient evidence favoring the nonmoving

---

[7]Neither CTS's complaint nor its amended complaint clearly state which rights under 42
U.S.C. § 1983 were violated.  But CTS's response to defendants' motion for summary judgment
focuses exclusively on substantive due process and equal protection claims.  Defendants, in their
motion for summary judgment, characterize CTS' due process claim as one for procedural due
process.  The court will consider all three of these constitutional claims.

party for a jury to return a verdict for that party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).  If the nonmoving party fails to make a sufficient showing on an essential element of that party's case with respect to which it bears the burden of proof, summary judgment should be granted.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

      **A.     Due Process Claim**

      The due process clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  There must be a deprivation of an underlying fundamental right or interest.  The fundamental right CTS claims is a property interest in the enforcement of  Philadelphia Code § 17-107(2)(b)(.2), authorizing exemptions from the city's prevailing wage requirements.  According to CTS, defendants' ongoing refusal to grant its trainees an exemption from Philadelphia's prevailing wage requirement has caused it to lose a substantial amount of funding because of a reduced ability to place its trainees; it claims this loss of funding is a deprivation of a property right in violation of its Fourteenth Amendment due process rights.

      Defendants argue that § 17-107(2)(b)(.2) never went into effect, so CTS has no rights under it and cannot compel its enforcement.  CTS argues in response that since defendants enforced other provisions of the Ordinance of which § 17-107(2)(b)(.2) was a part, they are estopped from denying the effectiveness of the entire ordinance.

      To estop a government agency, a plaintiff must establish: (1) that the agency intentionally or negligently misrepresented some material fact; (2) the agency had knowledge or reason to know that the other party would rely upon it; and (3) the agency induced the other party to act to its detriment because of justifiable reliance upon the misrepresentation.  See <u>Strunk v. Zoning</u>

Hearing Bd. of Upper Milford Tp., 684 A.2d 682, 685 (Pa.Cmwlth. 1996).

Defendants clearly acted as if § 17-107(2)(b)(.2) were in effect.  Both DiVirgilio and Ferraro admitted they were unaware that Ordinance 990221-A had not been properly certified before the present litigation.  Ferraro also admitted that his office enforced § 17-107(10), the broadening of the prevailing wage requirement's applicability, even though that provision's effectiveness was also conditioned on certification.  CTS would not have sought wage exemptions under § 17-107(2)(b)(.2) had it known that the provision was not in effect for lack of the MBEC certification required by footnote 22.

However, CTS can not estop defendants from denying § 17-107(2)(b)(.2)'s applicability to this action, since the record does not show that CTS sought wage exemptions in reliance on defendants' negligent misrepresentations that § 17-107(2)(b)(.2) was in effect, or that such reliance would have been justified.  If (2)(b)(.2) never became effective, CTS can not claim defendants deprived it of funding by failing to grant its trainees wage exemptions under that provision. The CTS due process claim fails for lack of an underlying constitutionally protected property right.[8]

---

[8]CTS might have had a colorable claim for Fourteenth Amendment procedural due process deprivation had it sought and gained approval by the United States Department of Labor or by the Pennsylvania Department of Labor and Industry as a bona fide apprenticeship program and still been denied prevailing wage exemptions by defendants.  CTS could have argued that defendants, with obvious union loyalties and conflicts of interest, were *per se* biased and incapable of fair decision-making.  "[D]ue process demands impartiality on the part of those who function in judicial or quasi-judicial capacities."  Schweiker v. McClure, 456 U.S. 188, 195 (1982).  This principal holds true for administrative agency decision-makers as well as the judiciary.  See Gibson v. Berryhill, 411 U.S. 564, 579 (1973).  Even an "indirect or somewhat less than substantial" financial interest in the outcome of a case or administrative decision may be enough to disqualify a decision-maker.  Trust and Inv. Advisers, Inc., v. Hogsett, 43 F.3d 290, 295 (7th Cir. 1994).

In Independence Public Media of Philadelphia, Inc., v. Pennsylvania Public Television

B.      **Equal protection claim**

The Fourteenth Amendment's equal protection clause requires that all similarly situated entities be treated alike.  Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985).  A plaintiff bringing a claim under 42 U.S.C. § 1983 for denial of equal protection must show it received different treatment from that received by others similarly situated.  Andrews v. City of Philadelphia, 895 F.2d 1469, 1478 (3d Cir. 1990).  Persons are similarly situated under the equal protection clause when they are alike "in all relevant aspects."  Nordlinger v. Hahn, 505 U.S. 1, 10 (1992); Startzell v. City of Philadelphia, Pennsylvania, 533 F.3d 183, 203 (3d Cir. 2008).

Defendants argue there is no evidence members of CTS programs were treated differently than any members of similarly situated entities with training programs not approved by the Pennsylvania Department of Labor and Industry.  Defendants insist that the City enforces the prevailing wage exemption equally for all apprenticeship programs approved by the Department of Labor and Industry, whether or not they are union apprenticeship programs.

CTS alleges there is no rational basis for defendants' enforcement of the City's prevailing wage requirement against trainees in non-union training programs, but not against members of union apprenticeship programs.  CTS' argument fails on two grounds:  first, § 17-107(2)(b)(.2) and its prevailing wage exemption for city-approved training programs never went into effect.

Network Commission, 808 F. Supp. 416 (E.D. Pa. 1992), whose facts in some respects bear a striking resemblance to this action, the Pennsylvania Public Television Network Commission was held incapable of ruling fairly on whether to allow a new public television station to join the Pennsylvania Public Television Network.  Every other public television station in Pennsylvania had a representative on the commission; adding a new station to the network might dilute the other member stations' funding.  The court found the resulting conflict of interest strong enough to render the commission unconstitutionally biased.  Independence Public Media, 808 F. Supp. at 424-27.

The CTS argument that defendants would have granted it an exemption under that provision if it were union-affiliated is not convincing.  Second, CTS has not demonstrated that it (or any non-union affiliated entity, for that matter) sought approval by the Pennsylvania Department of Labor and Industry as a bona fide apprenticeship program eligible for prevailing wage exemptions under § 17-107(2)(b)(.1).  Without such approval, the CTS argument that defendants would have treated it or any other non-union bona fide apprenticeship program differently just for being non-union is also speculative.  Summary judgment will therefore be granted in favor of defendants on CTS' equal protection claim.

### C.    Claim under the Pennsylvania Public Official and Employee Ethics Act

There is supplemental jurisdiction to hear state-law claims related to federal claims over which this court has original jurisdiction if "part of the same case or controversy."  28 U.S.C. § 1367(a).  Having granted summary judgment on plaintiff's federal claims, the court has discretion to exercise jurisdiction over the remaining state law claim.  28 U.S.C. § 1367(c)(3).

Count III of plaintiff's complaint was severed and stayed by the court's order of August 7, 2007, and neither party has been heard on this count.  The parties will be allowed to brief whether the court should decline or exercise supplemental jurisdiction over count III of plaintiff's complaint.

### IV.    CONCLUSION

Defendants' motion for summary judgment will be granted as to counts I and II of plaintiff's claims.  The parties will be allowed an opportunity to brief whether the court should dismiss count III under 28 U.S.C. § 1367(c)(3).  An appropriate order follows.

14

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CONNECTION TRAINING SERVICES,** | : | **CIVIL ACTION** |
| **a Pennsylvania non-profit corporation** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **THE CITY OF PHILADELPHIA,** | : | |
| **PERRITTI DIVIRGILIO, individually, and** | : | |
| **JAMES FERRARO, individually** | : | **NO. 06-3753** |

**ORDER**

**AND NOW**, this 30th day of December, 2008, upon consideration of defendants' motion for summary judgment and plaintiff's response, it is **ORDERED:**

1.  Defendants' motion for summary judgment (paper no. 44) is **GRANTED** as to counts I and II of the complaint.

2.  There being no federal question remaining, the parties, on or before **January 15, 2009**, may brief whether the court should decline or exercise supplemental jurisdiction over count III, plaintiff's claim under the Pennsylvania Public Official and Employee Ethics Act, 65 P.S.A. § 1101 *et seq.*  See 28 U.S.C. § 1367(c)(3).

 /s/ Norma L. Shapiro
Norma L. Shapiro, J.